## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| Johnny Walker, | : | Case No. 1:09CV1092 |
| | : | |
| Petitioner | : | Judge John R. Adams |
| | : | |
| v. | : | Magistrate Judge David S. Perelman |
| | : | |
| Keith Smith, Warden, | : | |
| | : | **REPORT AND RECOMMENDED** |
| | : | **DECISION** |
| Respondent | : | |

In this action in habeas corpus, 28 U.S.C. §2254, petitioner challenges the constitutionality of his October 20, 2005 conviction pursuant to a jury trial of one count of aggravated murder, with firearm specifications, and one count of attempted aggravated murder, with firearm specifications.[1] The petitioner having waived his right to a jury on one count of having a weapon while under a disability[2], was also convicted on October 21, 2005 by the trial court on that count.  Petitioner was sentenced to an indefinite term of twenty years to life imprisonment for aggravated murder, eight years for attempted aggravated murder, and three years for having a weapon while under a

---

[1]Prior to submitting the case to the jury for deliberations, petitioner was acquitted of one count of aggravated robbery. In addition, one count of possession of crack cocaine with specifications, and one count of trafficking in crack cocaine with specifications, were dismissed.  Also dismissed prior to deliberations were mass murder and felony mass murder specifications.

[2]Although respondent represented that petitioner was charged with two counts of having a weapon while under a disability, this Court's review of the indictment revealed that petitioner and a co-defendant were each charged with one count of having a weapon while under a disability.

disability, with the sentences on the murder charges to run consecutive to each other but concurrent with the term for having a weapon while under a disability.  He was also sentenced to six years for the firearm specifications, to run concurrent to each other but consecutive to the sentences on the main charges, for an aggregate sentence of thirty-four years to life.

Petitioner appealed his convictions to the Ohio Eighth District Court of Appeals alleging five assignments of error:

> I.   The trial court erred to the appellant's prejudice when it overruled the appellant's motion to suppress.
>
> II.  Appellant's Sixth Amendment right to confront witnesses against him was violated when police officers were permitted to present hearsay testimony of statements made by the co-defendant.
>
> III. The convictions for aggravated murder and attempted aggravated murder were against the manifest weight of the evidence.
>
> IV.  The evidence was insufficient to support convictions for aggravated murder and attempted aggravated murder.
>
> V.   The trial court erred by sentencing the appellant to consecutive sentences.

On February 26, 2007 the appellate court affirmed the convictions, but vacated the sentences and remanded the case for re-sentencing consistent with the decision of the state supreme court in State v. Foster, 109 Ohio St.3d 1, 845 N.E.2d 470 (2006).

In its opinion, that court summarized the facts in petitioner's case as follows:

> The evidence established that Marique Farr was a drug dealer who worked in the area of Superior Hill.  Jessica Weakley was his girlfriend.  Defendant Nia was holding $26,000 that belonged to Farr, but returned this money to him approximately one week prior to the shooting.

2

On August 26, 2004, Farr's wife Cinnamon rented a car for Farr and he planned to drive to Fort Wayne, Indiana later that night to purchase drugs. Weakley, a senior in high school, told her parents that she was going to a sleep-over, and agreed to accompany Farr as he drove to Indiana.

In the afternoon on August 26, 2004, Farr and Weakley prepared for their trip.  Farr had a backpack containing $26,000 in the backseat of the car with which he planned to buy a kilo of cocaine.  Farr called Nia and arranged to pick up $100 which Nia owed him.  Nia asked Farr to pick up defendant, whom he referred to as "Cash." Farr and Weakley picked defendant up in the area of Belmar and Superior, then drove to Nia's house on Coventry.  They waited in the driveway for Nia and Nia asked defendant to come up to his apartment.  After a few minutes, defendant and Nia got back into the car and Nia gave Farr the money he owed him.

Nia then asked Farr to drive him to his aunt's house at Coventry near Superior so that he could pick up his car, a red Chevrolet.  Farr drove with Weakley in the front passenger seat, defendant in the rear passenger's side seat, and Nia in the rear driver's side seat. Nia's car was not in the parking lot and Nia made a few phone calls then told Farr to wait. Farr next observed defendant scooting toward Nia.  Defendant had a black gun in his hand.  Defendant then shot Farr.  Weakley screamed, more shots were fired and Weakley slumped forward.

Weakley was shot behind her left ear with a 9 millimeter weapon. There was no fouling or stippling at the wound, but it caused a severe brain and brain stem injury which caused death within a few minutes.  No gunshot residue was found on the girl.  Farr was shot in the head and suffered severe and life threatening injuries to the right side of his brain.  He is now blind and paralyzed on his left side.

The vehicle was towed to the coroner's office with Weakley's body still inside.  Three nine-millimeter shell casings were found in the passenger compartment.  Neither a backpack nor money was recovered from the car.  A homemade silencer for a weapon was recovered from the front passenger's seat.  Gunshot residue was present within this item.

Christopher Page, who had been staying at his fiance's apartment on Superior Road, was standing with family members in the parking

3

lot at the back of the building and heard the sound of a car crashing, then heard three or four shots.  He observed a male in beige pants and a coat covering his face grab items out of a gray car.  He did not know the man's race, but his arm was "light skinned."  The man left and Page noticed that two people were in the car.  A female occupant appeared dead but the male occupant began coughing up blood.  Page's uncle called the police.  Police and EMS arrived on the scene at approximately 4:55 p.m.  Page subsequently described the man to police as a black male, with a medium complexion, wearing a black basketball jersey with no shirt underneath, and beige pants.

Marique Farr was in a coma for several days following the shooting.  Although he later regained his ability to speak, he initially responded to his doctor and to the police through finger and hand movements.  The police subpoenaed Farr's cell phone records.  They presented Farr with the names of various suspects.  When asked about Nia, a name provided to East Cleveland Det. Marche by an anonymous tipster, Farr positively responded.  Nia was subsequently questioned and told police that he saw Farr and Weakley on the date of the shootings but did not speak to them.  Phone records demonstrated, however, that Nia had called Farr six times on the date of the shooting.  In a second statement, Nia told Det. Marche that he owed Farr $300 and Farr wanted his money before he left for Indiana later that day.  According to Nia's written statement, Farr related that someone named Cee Cee had tried to rob him.  The next day, Cee Cee told Nia that he had heard Farr wanted to kill him and he was going to kill Farr before Farr killed him.

Nia added:

"I was on Union in Cleveland with Johnny selling dope, I had to front one of my young dudes some dope.  I was hustling in the area of 71 [st] and Ivey.  We were on our way to the hood on East 93 [rd] about to hit Kinsman, Johnny got a call from a crack head named Stacey that lives on Glenmont near Avon Dale that the girl next door something might have happened to her.  We didn't think anything about it and thought she was just playing games.  I just kept heading to the hood when me and Johnny started getting more and more calls. I got a call from Cuzo and Jay and they told me that Marique and Jessica had been shot.***."

Nia was jailed in connection with the homicide investigation.  He

4

passed a note to a "jail trustee" which indicated in part "Tell Jay *** to look under my passenger seat and grab that from the Malibu. Tell Cash they trying to play us, somebody telling them false information about us."

Det. Marche noted that a red Malibu had been parked near the crime scene.  A for sale sign on the car listed Nia's cell phone number. The department's drug dog alerted at the car and the officers subsequently recovered 70 grams of cocaine from the unlocked car. While they were towing the car, Jemall Simms, aka "Jay" approached and spoke with the officers.  The officers subsequently learned that "Cash" is defendant Johnny Walker.

Defendant drove past a few minutes later and was arrested.  Per department policy, his car was to be towed, and its contents were inventoried.  Police found a home made "suppressor" for weapon.

Defendant made a statement to police in which he indicated that he had seen Farr and a female on the day of the shooting, and that Nia had repaid Farr the money he owed Farr.  He denied shooting Farr and additionally stated that Nia was with him.  He acknowledged that the item found behind Weakley's body was a silencer and when asked who else would have a silencer defendant indicated, "just me and Mark [Farr]."

The silencer recovered from Farr's rented car and the metal "suppressor" recovered from defendant's trunk were both consistent in terms of the chemical composition of the adhesive portions of the tape.  The suppressor had particles indicative of gunshot primer residue and the silencer recovered from the rented car had gunshot residue.

Cell phone records demonstrated that defendant called Nia four times on August 26, 2004 and that defendant called Nia daily until August 27, 2004.  Farr called defendant eight times on the date of the shooting.  Defendant's cell phone was deactivated on September 10, 2004.

Nia's cell phone records indicated that he called defendant almost daily in August 2004.  On August 26, 2004, Nia called defendant approximately fifteen times, with the last call occurring at 4:56 p.m. Farr called Nia five times on the date of the shooting.  Nia called defendant once on the following day but did not call him again for the next four days.  Nia's cell phone was deactivated on September

13, 2004.

> With regard to the calls made on August 26, 2004, defendant called Nia at 4:41 p.m., while both were in East Cleveland.  Nia called defendant at 4:51 p.m, while both were in East Cleveland, and Nia attempted to call defendant at 4:56 p.m., while both were in East Cleveland.  Both men's cell phones were located in the vicinity of the cell phone tower located at 13800 Terrace Road, which includes the areas of Superior and Coventry Roads.

Petitioner, acting pro se, appealed the appellate court ruling to the Ohio Supreme Court alleging the following four propositions of law:

> **Proposition of Law No. I**: The trial court erred to the appellants [sic] prejudiced [sic] when it overruled the appellant's motion to suppress.

> **Proposition of Law No. II**: Appellant's Sixth Amendment right to confrontation of witness against him was violated when police officer's [sic] were permitted to present hearsay testimony of statements made by the Co-Defendant.

> **Proposition of Law No. III**: Appellant's conviction were [sic] against the manifest weight of the evidence.

> **Proposition of Law No. IV**: The Evidence [sic] was insufficient to support a conviction for Aggravated Murder and Attempted Aggravated Murder.

On June 20, 2007 the supreme court denied petitioner leave to appeal and dismissed the appeal as not involving any substantial constitutional question.

On May 4, 2007, during the pendency of his appeal to the state supreme court, petitioner was re-sentenced to an indefinite term of twenty years to life imprisonment for aggravated murder, six years for attempted aggravated murder, and three years for having a weapon while under a disability, with the terms for aggravated murder and attempted aggravated murder to run consecutive to one another, but concurrent with the sentence for having a weapon while under a

6

disability. Petitioner was also sentenced to six years incarceration on the firearms specifications on the murder/aggravated murder charges, to run concurrent to each other but consecutive to the sentences on the base charges, for an aggregate sentence of thirty-two years to life.

Petitioner appealed his re-sentencing to the Ohio Eighth District Court of Appeals alleging the following four assignments of error:

I. Whether appellant's sentence is contrary to law and violates due process because the trial court failed to consider whether the sentence was consistent with the sentence imposed for similar crimes by similar offenders.

II. Whether appellant was deprived of his liberty without due process of law when he was sentenced under a judicially altered, retroactively applied, and substantially disadvantageous statutory framework.

III. The trial court erred in not imposing post-release control as part of the felony sentence on counts five and eight.

IV. Trial counsel was ineffective for failing to object to the retroactive application of the remedy outlined in State v. Foster.

On May 19, 2008 the appellate court remanded petitioner's case for re-sentencing in light of the failure of the trial court to inform petitioner about post-release control. The court also analyzed, and overruled, the remaining claims for relief.

On September 5, 2008 petitioner was again re-sentenced to the same sentence imposed upon the previous re-sentencing. Petitioner did not appeal the second re-sentencing.

On May 12, 2009 the petitioner, acting pro se, filed the instant petition, in which he raises the following three claims for relief:

A.     **GROUND ONE:**   Due Process/ Warrantless Arrest– Motion to Suppress Evidence.

**Supporting FACTS**: The trial court erred when it overruled the Appellant's motion to suppress.

**B.**     **GROUND TWO:** Due Process/ Confrontation Clause.

**Supporting FACTS**: Appellant's Sixth Amendment right to confront witnesses against him was violated when police officer's [sic] were permitted to present hearsay testimony of statements made by the Co-defendant.

**C.**     **GROUND THREE:** Due Process/ Insufficient Evidence.

**Supporting FACTS**: The evidence was insufficient to support a conviction for Aggravated Murder and Attempted Aggravated Murder.

The provisions of the Antiterrorism and Effective Death Penalty Act, "AEDPA," Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 26, 1996) are controlling herein as the instant petition was filed after the Act's effective date. <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997).

The provisions of the Antiterrorism and Effective Death Penalty Act, "AEDPA," Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 26, 1996) are controlling herein as the instant petition was filed after the Act's effective date.  <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997).[3]

The role of a federal district court in habeas corpus is set forth in Title 28 U.S.C. § 2254 (d) which provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[3]There are no issues of procedural default or untimeliness raised by the respondent in this case.

8

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Supreme Court has held that the clauses "contrary to" and "unreasonable application of" as found in §2254(d)(1) have independent meanings; Williams v. Taylor, 529 U.S. 420 (2000), with the state court adjudication being "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that of the Supreme Court];" and with the state court adjudication involving an "unreasonable application of clearly established Federal law, as determined by the Supreme Court" "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or "if the state court either unreasonably extends a legal principal from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principal to a new context where it should not apply or unreasonably refuses to extend that principal to a new context where it should apply."  120 S.Ct. at 1519-1520.   In deciphering the "unreasonable application" clause this Court must inquire as to whether "the state court's application of clearly established federal law was objectively unreasonable." Id. at 1521. Even if the state court decision resulted in an incorrect application of federal law, if that decision is reasonable it will stand. Id. See, Machacek v. Hofbauer, 213 F.3d 947, 953 (6th Cir. 2000).

In his first claim for relief the petitioner argues, as he did in the state courts, that the trial court improperly denied his motion to suppress his statements and all evidence seized pursuant to his arrest, which he alleges was unreasonable under the Fourth Amendment.  The respondent argues

that this claim should be dismissed, as petitioner's claims of Fourth Amendment violations were fully and fairly litigated in the state courts.

Full and fair litigation by the state courts of a Fourth Amendment claim based on alleged unconstitutional search and seizure precludes federal habeas corpus review of that claim. Kuhlmann v. Wilson, 477 U.S. 436 (1986); Stone v. Powell, 428 U.S. 465, 494 (1976). See also, Machacek v. Hofbauer, 213 F.3d 947, 952 (6th Cir. 2000), cert. denied, 531 U.S. 1089 (2001) ("Petitioner's Fourth Amendment claim is not reviewable."); Marsack v. Howes, 300 F.Supp.2d 483, 493 (E.Dist.Mich. 2004) ("[T]he limitation on review of Fourth Amendment claims imposed by the Supreme Court in *Stone v. Powell*,...precludes relief on the basis of that Amendment."). Cf, Reedus v. Stegall, 79 Fed. Appx.93, 96 (6th Cir. October 14, 2003). In order for a Fourth Amendment claim of this sort to be fully and fairly litigated there must be a state procedural mechanism which provides the opportunity to raise the claim, and the actual presentation of the claim must not be impeded by a failure of such procedural mechanism. Riley v. Gray, 674 F.2d 522, 526 (6th Cir. 1982), cert. denied, 459 U.S. 948 (1982). It has been held that the State of Ohio provides an adequate state procedural mechanism to raise a Fourth Amendment claim in Rule 12 of the Ohio Rules of Criminal Procedure, which provides for a pretrial motion to suppress and the opportunity of a direct appeal of the ruling on motion to suppress. Riley v. Gray, supra at 526.

The petitioner employed the state procedural mechanism, as illustrated by the following summary by the state appellate court:

> Defendant's first assignment of error states:
>
>  "The trial court erred to the appellant's prejudice when it overruled the appellant's motion to suppress."
>
> Within this assignment of error, defendant complains that there was

10

no probable cause to arrest him in connection with the shootings of Weakley and Farr.  He therefore claims that all evidence seized and all statements taken from defendant should have been suppressed.

With regard to our standard of review, we note that an appellate court must accept the trial court's findings of fact if supported by competent, credible evidence.  *State v. Guysinger* (1993), 86 Ohio App.3d 592, 594, 621 N.E.2d 726.  We are to then independently determine as a matter of law, without deferring to the trial court's conclusions, whether the facts meet the applicable legal standard. *State v. Klein* (1991), 73 Ohio App.3d 486, 488, 597 N.E.2d 1141. *State v. Kobi* (1997), 122 Ohio App.3d 160, 168, 701 N.E.2d 420.

With regard to the substantive law, we note that "[a]n arrest without a warrant is constitutionally invalid unless the arresting officer had probable cause to make it at that time.  To have probable cause, the arresting officer must have sufficient information derived from a reasonably trustworthy source to warrant a prudent man in believing that a felony has been committed and that it has been committed by the accused." *State v. Timson* (1974), 38 Ohio St.2d 122, 311 N.E.2d 16, paragraph one of the syllabus; *State v. Kobi*, supra, citing *Beck v. Ohio* (1964), 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142.

The assessment of probable cause is based on a review of the "totality-of-the-circumstances," and involves a practical, common sense review of the facts available to the officer at the time. *Illinois v. Gates* (1983), 462 U.S. 213, 76 L.Ed.2d 527, 103 S.Ct. 2317.  This is a practical, nontechnical conception that deals with probabilities and not certainties.  Id., 462 U.S. at 231.  The *Gates* Court acknowledged that informant's tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability.  The court abandoned the rigid application of "veracity" or "reliability" and "basis of knowledge" found in *Aguilar v. Texas* (1964), 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723, and *Spinelli v. United States* (1969), 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637, and noted that these are issues that may usefully illuminate the common sense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.  The Court noted that an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.  Id.  The Court stated:

11

> "While a conscientious assessment of the basis for crediting such tips is required by the Fourth Amendment, a standard that leaves virtually no place for anonymous citizen informants is not."

Id., U.S. at 238.

In this matter, the supplemental transcript of the suppression hearing indicates that Det. Marche spoke to Farr's wife, Cinnamon, then spoke to Dwight Whiteside to learn the names of Farr's associates. Whiteside indicated that "Kombi" and "Boo" were possible suspects. Using the super name search feature of the LEADS data terminal, Det. Marche then determined that "Kombi" was defendant Akanbi Nia. Farr's wife then told police that Nia was her husband's friend.

On September 8, 2004, Det. Marche received an anonymous phone call identifying "Kombi" and "Cash" as the assailants. The caller claimed that Farr had $60,000 and a kilo of cocaine at the time of the shooting and that the attack was a "robbery that went bad." The caller also instructed the police to check Farr's cell phone records.

Although Farr could not speak, Cinnamon Farr named possible suspects. Farr did not respond to some of the names, but he squeezed her hand when she said Nia's name.

Nia subsequently made a statement to police in which he indicated that he saw Farr and Weakley on the date of the shootings but did not speak to them. Det. March obtained Nia's cell phone number and learned, however, that Nia had called Farr six times on the date of the shooting. Det. Marche mirandized him and Nia later stated that he owed Farr $300 and Farr wanted his money before he left for Indiana later that day. Nia was later held in connection with the homicide investigation.

Nia then passed a note to an incarcerated trustee named Daniel Wilson, which indicated in part "Tell Jay *** to look under my passenger seat and grab that from the Malibu. Tell Cash, they try to play us, somebody telling them false information about us."

The detective recalled that there was a red Malibu parked near the crime scene. They noted that a for sale sign on the car had Nia's cell phone number. The department's drug dog alerted at the car and the officers subsequently recovered 70 grams of cocaine from the unlocked car. While they were towing the car, Jemall Simms, aka

12

"Jay" approached and asked what the officers were doing.  At this time, they learned from Simms that "Cash" was defendant Johnny Walker.  One of the detectives knew defendant Walker and observed him drive past a few minutes later.  He was arrested, and per department policy, his car was towed.  At this time, they found a homemade suppressor for a weapon.  Defendant Walker was mirandized and made a statement and Nia also made another statement to police after Miranda warnings were again given to him.

From the foregoing, we agree with the trial court's conclusion that the totality of the circumstances indicate that the arrest was supported by probable cause. The investigating officers received information that "Kombi" and "Cash" were the assailants and that it was a robbery that went bad.  Later, Cinnamon Farr indicated that Farr had indicated that Nia was involved.  Nia then wrote a note that implicated "Cash" and noted that something had to be taken out of his Malibu.  As the officers searched the car, defendant drove by and was identified as "Cash." The totality of the circumstances clearly established probable cause, though various clues linking [sic] the crime to Nia, and then to defendant.  Although an anonymous tip was provided and this implicated "Cash," this information was subsequently corroborated by Nia's note which indicated in relevant part, "Tell Cash they trying to play us, somebody telling them false information about us."

Moreover, the subsequent search of defendant's car, including the trunk, was also proper as police are permitted to conduct inventory searches of vehicles for a limited purpose, such as where, by policy, they are to catalogue the contents of an impounded vehicle.  See *South Dakota v. Opperman* (1976), 428 U.S. 364, 376, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000; *State v. Mesa*, 87 Ohio St.3d 105, 108-109, 1999-Ohio-253, 717 N.E.2d 329, 332, 333.  See also, *State v. Poole*, Cuyahoga App. No. 80250, 2002-Ohio-5326 (officer's inventory search of vehicle including the trunk and suitcases was proper where car was to be towed); *State v. Bridges*, Cuyahoga App. No. 80171, 2002-Ohio-3771 (same); *State v. Kerr*, Wood App. No. WD-05-080, 2006-Ohio-6058; [sic] In such instances, contraband may be immediately seized.  *State v. Schultz,* Lake App. No. 2003-L-156, 2005-Ohio-345.

In accordance with the foregoing, we note that the evidence established that it is a policy of the East Cleveland Police Department to conduct an inventory search where an arrestee's car is to be impounded.  The trial court properly concluded that the

> police were therefore permitted to conduct an inventory search of the car, including the trunk, and the trial court did not err in refusing to suppress admission of the homemade silencer found at this time.

Petitioner made full use of the state procedural mechanisms available to raise his claims of violation of his Fourth Amendment rights and there is no evidence that presentation of his claims was impeded by the failure of such mechanism.  Although petitioner disagrees with the trial court's denial of his motion to suppress, it was reasonable to conclude that the totality of the circumstances (including in part an informant's tip, cell phone records, and Nia's note to Wilson corroborating the informant's tip ) contributed to the reasonable suspicion that criminal behavior had occurred. Consequently, petitioner's first claim for relief is without merit.

In his second claim for relief the petitioner challenges the admission into evidence of statements of his co-defendant, Akanbi Nia, who did not testify at trial.

To be entitled to relief in federal habeas corpus a petitioner must establish that there has been infringement of a right guaranteed under the United States Constitution.  Clemmons v. Sowders, 34 F.3d 352, 357 (6th Cir. 1994).  As a general rule, an error in the admissibility of evidence does not constitute such a denial, as such errors are matters of state law not cognizable in habeas corpus.  Byrd v. Collins, 209 F.3d 486, 528 (6th Cir. 2000), cert. denied, 531 U.S. 1082 (2001).  Stated differently, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."  Roe v. Baker, 316 F.3d 557, 567 (6th Cir.  2002).  Under the AEDPA the states have wide latitude in ruling on evidentiary matters.  Seymour v. Walker, 224 F.3d 542 (6th Cir. 2000), cert. denied, 532 U.S. 989 (2001).   In considering a habeas corpus petition a federal court may not grant such petition merely because it disagrees with the evidentiary rulings of the state courts, but may only grant relief if the state court's evidentiary rulings were contrary to rulings of the United State

Supreme Court on a similar question of law or if the state courts decided the evidentiary issues differently than the Supreme Court in a case with materially indistinguishable facts. <u>Sanders v. Freeman</u>, 221 F.3d 846 (6th Cir. 2000).

      The Sixth Amendment to the United States Constitution guarantees to a criminal defendant the right to be confronted with the witnesses against him or her in order to cross-examine them. <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 678 (1986). Cross-examination into a witness' motivation in testifying and an opportunity to test credibility and bias is of particular importance to fulfillment of this constitutional right. <u>Davis v. Alaska</u>, 415 U.S. 308, 316 (1974). When the prosecution seeks to offer into evidence the statements of an unavailable witness against a criminal defendant courts must determine whether the Confrontation Clause is violated by such testimony without forcing the declarant "to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth.'" <u>California v. Green</u>, 399 U.S. 149, 158 (1970).

      While it is true that the United States Supreme Court, in <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), determined that the Confrontation Clause prohibits the admission of hearsay testimony unless the witness is unavailable and the accused has had an opportunity to cross-examine the declarant, that ruling applied only to testimonial hearsay statements, and does not apply to non-testimonial hearsay statements. 541 U.S. at 68. Accord, <u>United States v. Deitz</u>, 577 F.3d 672, 683 (6th Cir. 2009); <u>United States v. Gibbs</u>, 506 F.3d 479, 486 (6th Cir. 2007). The prosecution is permitted to introduce into evidence a non-testimonial hearsay statement of an unavailable declarant, provided that the statement bears "adequate indicia of reliability," which may be inferred if the statement falls "within a firmly rooted hearsay exception." <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980).

When reviewed in the context of a petition for writ of habeas corpus a federal court must determine whether the ruling of the state appellate court on this issue was contrary to, or involved an unreasonable application of, clearly established law.

The state appellate court rejected petitioner's claim of violation of his Confrontation Clause rights, holding in pertinent part:

> Defendant's second assignment of error states:
>
> "Appellant's Sixth Amendment right to confront witnesses against him was violated when police officers were permitted to present hearsay statements made by the co-defendant."
>
> Within this assignment of error, defendant complains that the trial court erred in allowing the introduction of co-defendant's Nia's statements to police since Nia was not determined to be unavailable and was not subject to cross-examination.
>
> The Sixth Amendment's Confrontation Clause provides that, "in all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him."
>
> In general, the Confrontation Clause of the Sixth Amendment prohibits the admission of extrajudicial statements of a non-testifying co-defendant which inculpate the accused. See *State v. Moritz* (1980), 63 Ohio St.2d 150, 407 N.E.2d 1268, paragraph one of the syllabus, following *Bruton v. United States* (1968), 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. In *Bruton*, supra, the United States Supreme Court held that the admission of a non-testifying co-defendant's confession, which clearly implicated another defendant at a joint trial, was a violation of that defendant's rights under the Confrontation Clause, and noted that the non-testifying co-defendant's confession "added substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination, since [the co-defendant] did not take the stand." Id. at 128. The rationale was that a co-defendant's confession that implicates another defendant is both "devastating to the defendant" and inherently untrustworthy "given the recognized motivation to shift blame onto others." Id. at 136. Accord *State v. Hubbard*, Cuyahoga App. No. 83384, 2004-Ohio-4627; *State v. Parker* (1991), 72 Ohio App.3d 456, 594 N.E.2d 1033.
>
> The recent Supreme Court decision in *Crawford v. Washington*

16

(2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177, does not alter our conclusion. In *Crawford*, the Supreme Court emphasized that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure and particularly its use of ex parte examinations as evidence against the accused."  Id. at 1363. Moreover, in *United States v. Simpson* (C.A. 6, 2004), 116 Fed. Appx. 736, vacated as to sentence *United States v. Simpson* (2005), 543 U.S. 1182, 125 S.Ct. 1418, 161 L.Ed.2d 180, the Court held that statements which exculpated the defendant, rather than incriminated him, were not admitted in violation of the Confrontation Clause.  The Court stated:

"Nor does *Crawford v. Washington*, 541 U.S. 36, 158 L.Ed.2d 177, 124 S.Ct. 1354 (2004), change our analysis. In *Crawford*, the Supreme Court emphasized that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure and particularly its use of ex parte examinations as evidence against the accused."  Id. at 1363.  The Court went on to note that "the text of the Confrontation Clause reflects this focus.  It applies to witnesses against the accused." Id. at 1364 (emphasis added).  But here, because the statements exculpated Bowers, rather than incriminated him, they cannot be said to have been used against him nor to have prejudiced him."

*Crawford* made explicit that "the Clause does not bar the use and admission of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted."  Id., 541 U.S. at 59 n. 9.  This is consistent with the general rule that when an out-of-court statement is not offered to prove the truth of the matter asserted, the Confrontation Clause is not implicated.  *Tennessee v. Street* (1985), 471 U.S. 409, 413, 105 S.Ct. 2078, 85 L.Ed.2d 425;  *United States v. Sexton* (2005), 119 Fed. Appx. 735.

In this matter, however, Nia's statements to police did not implicate either co-defendant as Nia first stated that on August 23, 2004, he had observed Farr and others selling drugs.  According to Nia's written statement, Farr related that someone named Cee Cee had tried to rob him.  The next day, Cee Cee told Nia that he had heard Farr wanted to kill him and he was going to kill Farr before Farr killed him.

Nia added:

"I was on Union in Cleveland with Johnny selling dope, I had to front one of my young dudes some dope.  I was hustling in the area of 71[st] and Ivey.  We were on our way to the hood on East 93[rd] about to hit

17

Kinsman, Johnny got a call from a crack head named Stacey that lives on Glenmont near Avon Dale that the girl next door something might have happened to her.  We didn't think anything about it and thought she was just playing games.  I just kept heading to the hood when me and Johnny started getting more and more calls, I got a call from Cuzo and Jay and they told me that Marique and Jessica had been shot.***."

We conclude that the introduction of this evidence did not constitute a *Bruton* violation as Nia's statement did not implicate defendant.  Similarly, introduction of this evidence did not violate the Confrontation Clause as it was not inculpatory of defendant and was not used for the truth of the matter asserted.

With regard to Nia's additional statement to police: "That is a homemade silencer that belongs to Marique Farr that I saw him and Johnny Walker make in the white van," we have already determined that the trial court did not err in refusing to suppress the homemade silencer found in defendant's car.  In addition, in his own statement to police defendant admitted that he had a "dummy silencer for a handgun."  We find no prejudicial error in connection with this statement.

Applying the authorities cited above, the state court's admission of the statements of petitioner's non-testifying co-defendant was not contrary to, nor did it constitute an unreasonable application of, clearly established federal law concerning a criminal defendant's Sixth Amendment right to confront the witnesses against him, particularly in light of the fact that the statements were non-testimonial, non-incriminating declarations, which were not used to prove the truth of the matter asserted, and petitioner admitted some of the information.  In fact, the prosecution sought to discredit Nia's statements, particularly his implication of Cee Cee as the shooter, and his claim that at the time of the shooting he and petitioner were "on Union...selling dope."

Even if the admission of the foregoing had been erroneous, any such error would have been harmless.

If a showing of a constitutional violation has been demonstrated, a court on habeas corpus review of the state conviction must also determine whether the error "`had substantial and injurious

18

effect or influence in determining the jury's verdict.'"  Brecht v. Abrahamson, 507 U.S. 619 (1993)

(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  Factors to be considered include:

"the importance of the witness' testimony in the prosecution's case, whether the testimony was

cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the

witness on material points, . . . and, of course, the overall strength of the prosecution's case." Van

Arsdall, 475 U.S. at 684.  This standard is more onerous than the Chapman v. California, 386 U.S.

18 (1967) harmless error standard which is applied by state courts on direct appeal, and is in

keeping with the habeas corpus philosophy that the role of the federal courts in review of state court

criminal convictions is to uphold "fundamental fairness" rather than relitigate state court

proceedings.  Brecht, 507 U.S. at 622.

Once again, Nia's statements having contradicted the prosecution's theory of the case, the

majority of the evidence presented by the prosecution contradicted Nia's statements, except his

statement regarding the silencer, which petitioner admitted.  These contradictory statements,

therefore, were not relied upon by the prosecution as evidence of petitioner's guilt, and there was

significant evidence contradicting these statements.  There was also strong evidence that petitioner

shot the victims, particularly the testimony of Marique Farr that it was petitioner who shot him, at

which time he heard multiple gunshots and heard the other victim's screams.  The foregoing factors

establish that even if there had been error in admitting Nia's statements, such error could not have

had a substantial and injurious effect or influence in determining the jury's verdict.  That being so,

petitioner's second claim for relief must fail.

In his third claim for relief the petitioner challenges the sufficiency of the evidence relied

upon to convict him at trial.

The standard for addressing an argument that a conviction is not supported by sufficient evidence was enunciated in <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979), as follows: "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Accord</u>, <u>McKenzie v. Smith</u>, 326 F.3d 721, 727 (6[th] Cir. 2003); <u>Matthews v. Abramajtys</u>, 319 F.3d 780, 788 (6[th] Cir. 2003).  In reaching its determination as to the sufficiency of the evidence this Court may not substitute its determination of guilt for that of the factfinder and may not weigh the credibility of the witnesses.  <u>Herrera v. Collins</u>, 506 U.S. 390, 401-402 (1993);  <u>Jackson v. Virginia</u>, 443 U.S. at 319, n.13; <u>Brown v. Davis</u>, 752 F.2d 1142 (6th Cir. 1985).

That standard has been modified somewhat by §2254(d) in that questions of sufficiency of the evidence are mixed questions of law and fact upon which a writ may be granted only if the adjudication of the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," §2254(d)(1), or was based upon "an unreasonable determination of the facts in light of the evidence presented" at petitioner's trial, §2254(d)(2).  <u>Starr v. Mitchell</u>, unreported, Case No. 98-4541, 2000 U.S.App. LEXIS 25646,*9-*10 (6th Cir. October 6, 2000).

The state appellate court reviewed petitioner's claims that he was convicted without sufficient proof and held in pertinent part:

> Defendant's fourth assignment of error states:
>
> "The evidence was insufficient to support convictions for aggravated murder and attempted aggravated murder."
>
> "Sufficiency of the evidence" is "'a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the

20

jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed. 1990) 1433.  The relevant inquiry when determining whether the evidence is sufficient to support the verdict "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E. 2d 492, paragraph two of the syllabus.

The state's evidence demonstrated that defendant and Nia called one another a number of times prior to the shooting.  Farr was in possession of $26,000 of cash.  The defendants asked Farr to drive them to an out-of-the-way location.  Farr observed defendant with a black gun in his hand. According to Farr, defendant shot him and then shot Weakley, who died at the scene.  A homemade silencer was found near her body.  Christopher Page observed a man removing items from the car shortly after he heard gunshots.  Phone records link defendant to Farr and Nia and Nia's note warns "Cash." Later, another homemade silencer was found in the trunk of his car. Viewing this evidence most favorable to the prosecution, any rational trier of fact could have found the essential elements of aggravated murder, attempted murder and having a weapon while under disability were established beyond a reasonable doubt.

In finding the evidence sufficient to prove the elements of the crimes charged the state court relied heavily on state authorities, with reference to the proper standard to be applied as defined by federal authorities, arriving at a decision which was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, nor was the decision based upon an unreasonable determination of the facts in light of the evidence presented.  That is particularly so in light of strong evidence that petitioner shot the victims, particularly the testimony of Marique Farr that it was petitioner who shot him and Ms. Weakley.   As a consequence, petitioner's third claim for relief is without merit.

In light of all the foregoing it is concluded that no claim of constitutional violation has been presented requiring further proceedings prior to disposition on the merits.

It is, therefore, recommended that the petition be dismissed without further proceedings.


s/DAVID S. PERELMAN
United States Magistrate Judge


DATE:   May 12, 2010


## OBJECTIONS

 Any objections to this Report and Recommended Decision must be filed with the Clerk of Courts within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See, United States v. Walters*, 638 F.2d 947 (6[th] Cir. 1981).  *See, also, Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).